IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEANETTE HARRIGAN-BRAXTON, et al., : | |
|     Plaintiffs, : | CIVIL ACTION |
|      : | No. 21-5240 |
|     v. : | |
|      : | |
| TEMPLE UNIVERSITY HOSPITAL, INC. : | |
|     Defendant. : | |

<u>**MEMORANDUM**</u>

Schiller, J.                                                                                                                                                         July 25, 2023

      Plaintiffs Jeanette Harrigan-Braxton, Charles Bowen, and Bunny Verette claim their employer Defendant Temple University Hospital (1) did not promote them to either of two management positions because they are African American and over age forty and (2) retaliated against them with written warnings after they went to Human Resources with a discrimination complaint. Temple Hospital moves for summary judgment on all their claims. Plaintiffs did not respond to the motion. The Court grants Temple Hospital's unopposed Motion because there are no genuine issues of material fact. It has demonstrated it is entitled to judgment as a matter of law.

**I.**    <u>**BACKGROUND**</u>

      Temple Hospital employs each Plaintiff as a full-time social worker at its Episcopal Campus ("Episcopal Hospital"): Harrigan-Braxton beginning in 2013, Bowen beginning in 2004, and Verette beginning in 2006. (Def.'s Stmt. of Undisputed Facts, ECF 9, ¶¶ 5-7.) Each Plaintiff is African American and over age fifty. (*Id.* ¶ 9.) Episcopal Hospital "provides inpatient and outpatient behavioral and primary care services, maintains 118 psychiatric beds, 21 medical beds, and" Philadelphia's "largest mental health crisis response center . . . ." (*Id.* ¶ 1.) Plaintiffs' duties "include interacting with mental health patients, attending team treatment meetings, interacting with insurance companies, overseeing patient housing applications, meeting with patients' family

members, and performing discharge planning." (*Id.* ¶ 8.)

Plaintiffs' claims involve Episcopal Hospital's decisions not to promote them to either: (1) Director of Utilization Management and Behavioral Health Therapy ("UMBHT Director"); or (2) Supervisor of Behavioral Health Services. (*Id.* ¶¶ 2-3.) Instead, another full-time Episcopal social worker, Kelly Kulp—who is Caucasian and was under age 40 at all relevant times—was promoted to UMBHT Director in July 2018. (*Id.* ¶ 10.) And in October 2018, Victoria Tuman, who is also Caucasian and under 40, was promoted to Supervisor. (*Id.* ¶ 11.)

A.     **The UMBHT Director Vacancy**

In March 2018, then-Director of Behavioral Health Doris Quiles announced her retirement. (*Id.* ¶ 13.) L.R. Rasi (Caucasian, over 40), then the UMBHT Director, applied for and received a promotion to her position, becoming Episcopal Hospital's Director of Behavior Health, who oversaw the UMBHT Director and Supervisor positions. (*Id.* ¶¶ 4, 13, 15.) Four Episcopal Hospital social workers applied to fill the newly-vacant UMBHT Director position: Plaintiffs Harrigan and Bowen along with Kulp and Madeline Hotz (Caucasian, under 40).[1] (*Id.* ¶ 14.) A three-person panel interviewed the UMBHT Director Applicants: Rasi, Sean Miller (Caucasian, under 40, who was a Supervisor at that time), and Yasser Al-Khatib (Middle Eastern, over 40, and, at the time, the Chief Nursing Officer). (*Id.* ¶ 15.) Rasi and Miller jointly interviewed the four applicants and Al-Khatib interviewed them by himself. (*Id.* ¶ 16.) The panel members completed Human Resources' Interview Evaluation Forms for each applicant to score applicants "in an objective standardized way" on "ten different skill sets, as well as on their strengths and weaknesses" and marked whether they would "recommend hiring this candidate." (*Id.*) Kulp received 113 points,

---

[1]     Verette alleges he was not interviewed for the UMBHT Director position although he submitted a timely online application. (ECF 9, ¶ 14 n.2.) However, there is no evidence he successfully completed the online application. (*Id.*)

2

Hotz: 100, Harrigan: 90, and Bowen: 86. (*Id.* ¶ 19.) Rasi also took simultaneous interview notes about each applicant's responses to questions about "management experience, familiarity with various software programs, experience performing 15 tasks required of the UMBHT Director, ideas for efficiency improvements, and thoughts on leadership." (*Id.* ¶ 17.) When the interviews were completed, the panel members met and "were in agreement that Kelly Kulp was by far the best choice." (*Id.* ¶ 18.) Each panel member recommended hiring Kulp on their Interview Evaluation Form and none recommended hiring any other applicant. (*Id.*) "Kulp had experience performing all 15 tasks required of the UHMBH Director while Ms. Harrigan and Mr. Bowen had performed, respectively, just 8 and 11 of those tasks." (*Id.* ¶ 20.) As a result, Rasi decided to promote Kulp to the UMBHT Director position, submitted necessary paperwork to HR, and Kulp accepted the position when it was offered to her. (*Id.* ¶ 21.)

  **B.** **The Supervisor Vacancy**

A Supervisor vacancy opened after Sean Miller announced his plan to leave Episcopal Hospital in September 2018. (*Id.* ¶ 22.) All Behavioral Health Staff were notified of the opening and eight out of ten Episcopal Hospital social workers applied, including all three plaintiffs (Harrigan-Braxton, Bowen and Verette), along with Hotz, Victoria Tuman (Caucasian, under 40), Yvonne Coffee (African American, over 40), Nancy Tran (Asian American, under 40), and Naja Hall (African American, under 40). (*Id.* ¶ 22.) Kulp asked the two social workers who had not applied for the opening and all behavioral health therapists to consider volunteering for a panel to interview and select a new Supervisor. (*Id.* ¶ 23.) Both non-applicant social workers and one behavioral health therapist volunteered to join the interview panel which ultimately included Rasi, Kulp, behavioral health therapist Venus Weaver (African American, over 40), and social workers John Berrios (African American/Latino, under 40) and Lauren Scarpiello (Caucasian, under 40).

(*Id.*)

Before conducting interviews, the interview panel for the Supervisor opening met to decide what questions to ask the applicants and who should ask the questions, resulting in a set of "Supervisor Screener" documents. (*Id.* ¶ 24.) Supervisor applicants "were asked unbiased questions" and "objectively scored in ten categories based on their responses . . . ." (*Id.* ¶ 25.) Each panel member noted applicants' strengths and weaknesses on a form and indicated whether they would recommend them for promotion. (*Id.*) Rasi took handwritten notes reflecting "each applicant's responses to questions on the Supervisor Screeners . . . ." (*Id.* ¶ 26.) Panelists anonymously submitted completed forms to an administrative assistant along with pre-printed slips of paper identifying their top three candidates by circling applicants' initials. (*Id.* ¶¶ 25-26.) When the interview panel reconvened to discuss applicants, panel members received packets including a spreadsheet tallying applicants' numerical scores, a chart listing applicants' strengths and weaknesses, completed Supervisor Screener documents, and a list of how many top-three votes each applicant received. (*Id.* ¶ 27.)

Tuman and Hotz tied for the top objective interview score on the Interview Evaluation Forms, scoring 248 points each. (*Id.* ¶ 28.) In contrast, the three Plaintiffs received the lowest scores of the eight Supervisor applicants. (*Id.*) Harrigan received 189 points, a sixth-place score. (*Id.*) Bowen landed seventh with 179 points. (*Id.*) Verette received 177 points, the lowest (eighth-place) score. (*Id.*) Tuman was the only applicant with a Certified Advanced Alcohol and Drug Counsel credential and was the only applicant who had already won Episcopal Hospital's exceptional employee award. (*Id.* ¶ 31.) Tuman also was the only applicant who each of the five interview panel members "recommended" for hiring at the bottom of their Interview Evaluation Forms and was the only applicant in each panel member's identified "top 3." (*Id.* ¶ 30.) In contrast,

Verette received five "no" votes on the Evaluation Form's "recommendation question."[2] (*Id.*) Bowen received four "no" votes. (*Id.*) Harrigan received three. (*Id.*)

Ultimately, when the interview panel met to review scores and select a Supervisor, the panelists—including two employees over age forty and two of Plaintiffs' African American peers—unanimously selected Victoria Tuman for the position and submitted her necessary paperwork to HR to complete her promotion to Supervisor.[3] (*Id.* ¶ 29.)

C.   The Applicants' Respective Work Histories

Episcopal Hospital social workers receive scored annual evaluations and the interview panels for the UMBHT Director and Supervisor vacancies considered applicants' scores. (*Id.* ¶ 33.) In the three years before interviews for the vacancies, Plaintiffs' average scores were lower than the scores of other applicants. Bowen's annual evaluation score was 2.23, Harrigan's was 2.2, and Verette's was 2.16. (*Id.*) In contrast, Kulp and Tuman each had an average score of 2.5. (*Id.*) Rasi testified that Kulp and Tuman's evaluation scores were consistently in the top five percent of the employees who reported to him, while Plaintiffs' evaluation scores were consistently in the bottom five percent. (*Id.* ¶ 34)

In the two years before Bowen applied for either vacancy, three attending physicians complained about his work, including his failure to: (1) adequately and timely perform discharge planning; (2) process needed insurance paperwork; and (3) gather information required to provide informed decisions about patient care. (*Id.* ¶ 35.) A staff psychiatrist at Episcopal Hospital had

---

[2]   Upon review of the completed Interview Evaluation Forms at his deposition, Verette conceded that he should not have been hired for the Supervisor position. (ECF 9, ¶ 32.)

[3]   In 2022, Tuman resigned from the Supervisor position to take a job elsewhere. An eight-person panel interviewed and ultimately hired Briana Stinson as her replacement. (ECF 9, ¶ 65.) Stinson is African American and was an Episcopal Hospital social worker for three years before her promotion. (*Id.*)

emailed Rasi to ask if there would be "consequences" for Bowen's continued failure to meet expectations. (*Id.*) Doctors and staff also complained about Harrigan's and Verette's performance, including when a patient's family member insisted on Verette's removal from his family member's care team in November 2017, specifically asking for Kulp as his replacement. (*Id.* ¶ 36.) In contrast, there is no evidence of complaints about Kulp's or Tuman's performance. (*Id.* ¶ 41.)

Also, before 2018, each Plaintiff was formally disciplined for having violated Temple Hospital's Corrective Action and Discipline Policy. (*Id.* ¶ 37.) Harrigan was disciplined in lieu of termination in 2015 after accumulating enough points for immediate termination under Temple Hospital's attendance and lateness policy. (*Id.* ¶ 38.) She was also formally disciplined for missing a 2015 court appearance with one of her mental health patients. (*Id.*) In 2016, Harrigan received a third formal discipline when she failed to review one of her patient's files, resulting in the hospital's loss of $64,000 in reimbursement funds that should have been insurer-paid. (*Id.*) Verette, like Harrigan had enough attendance and lateness issues to justify his termination, but Rasi instead gave him a written warning. (*Id.* ¶ 39.) Bowen also received several formal disciplines for attendance and lateness before applying for either vacancy. (*Id.* ¶ 40.) Again, in contrast, neither Kulp nor Tuman were ever issued any formal or informal discipline. (*Id.* ¶ 41.)

D. **Plaintiffs' Human Resources Complaint**

On October 17, 2018, Bowen emailed Rasi and Clara Galati, who then was the Assistant Hospital Director of Human Resources at Episcopal Hospital, to complain "on behalf of six minority social workers"—including himself, Verette, and Harrigan—"who applied for, but did not receive, the UMBHT Director and/or Supervisor positions." (*Id.* ¶ 42; *see also id.* ¶¶ 4, 12.) Bowen complained that the selection process involved "unfair hiring practices and discrimination in terms of race and age." (*Id.* ¶ 42.)

6

Upon receipt of their complaint, Rasi prepared typed notes summarizing the UMBHT Director and Supervisor position interviews, including criteria used, results, and bases for selecting Kulp and Tuman. (*Id.* ¶ 43.) Rasi's notes referenced the applicants' objective interview scores, whether they were "recommended" by panelists, their past evaluation scores, and how many times each applicant had previously volunteered in response to requests for help with short-staffing and similar issues. (*Id.* ¶ 43.) Tuman had volunteered to help most often: 21 times. (*Id.*)

Next, Rasi and Galati met to discuss Rasi's notes and to answer questions with all six minority social workers who were complaining about the hiring process. (*Id.* ¶ 44.) Galati investigated their contentions by meeting with them, interviewing interview panel members, and reviewing documents generated during the selection process. (*Id.* ¶ 45.) She observed that the positions were filled after interview panels had interviewed and objectively scored applicants for both positions and concluded that Kulp and Tuman were the most qualified and received the highest objective scores. (*Id.*) In Galati's opinion, the selection process had been fair, appropriate, and free from discriminatory conduct. (*Id.*)

### E. Plaintiffs' Post-Complaint Discipline

Each of the Plaintiffs was disciplined after complaining about the hiring selection process. Verette was disciplined in October 2019 after he brought a glass bottle to his office on a unit that housed patients with serious mental illness. (*Id.* ¶ 46.) One of them entered Verette's office, broke his bottle and began cutting herself with it. (*Id.*) A few weeks later, Verette brought a glass candy bowl to a meeting he was leading for patients with serious mental health issues, including the same patient. (*Id.* ¶ 47.) She grabbed the candy bowl, smashed it, and cut herself again, requiring emergency treatment. (*Id.*) Verette was not terminated for his conduct, which was deemed reckless, but was suspended for two weeks. (*Id.*) At his deposition, Verette conceded that his discipline for

7

the glass incidents was not in retaliation for his complaint about the hiring process. (*Id.* ¶ 48.) He was still employed at Temple Hospital as of February 2023. (*Id.* ¶ 47.)

Harrigan also was disciplined, but not fired, after the Human Resources complaint. In November 2018, she came to work and clocked in for her shift, but then left the hospital to go to Dunkin' Donuts without her manager's permission, returning twenty-eight minutes later, a "theft of time" violation eligible for immediate termination under the Corrective Action and Discipline Policy. (*Id.* ¶ 50.) At her deposition, Harrigan admitted her departure was against policy. (*Id.* ¶ 51.) Her only evidence of alleged retaliatory conduct is the "final written warning" Rasi gave her in lieu of termination. (*Id.* ¶¶ 50-51.)

Bowen supports his retaliation claim with a single written warning he received in October 2019, a year after the complaint to Human Resources. (*Id.* ¶ 51.) He was warned about: (1) inadequate discharge planning; (2) lack of follow-up with court paperwork, the clinical team, and an outside managed care company; and (3) failing to make timely submissions and respond to email. (*Id.*) Bowen was given a "Plan for Performance Improvement" and required to have monthly meetings with management. (*Id.*) Although he was the social workers' union vice president, Bowen did not file a union grievance about the written warning. (*Id.* ¶ 53.) Instead, he complained to his lawyer that his co-Plaintiff Verette (also African American and over 40) was not disciplined for similar performance issues. (*Id.*) At Bowen's deposition, he testified that he thought he "was just targeted and given a discipline that was unnecessary," but agreed he was not disciplined because of his race or because he complained to Human Resources. (Bowen Dep., Def.'s Ex. 3, ECF 9-3, at 186:7-15.)

Galati reviewed the post-complaint disciplines for Verette, Harrigan, and Bowen before they were issued and "determined that each discipline was warranted, appropriate, and followed

the proper process." (ECF 9, ¶ 19.)

### F. Other Minority Employees Received Promotions

In their Complaint, Plaintiffs allege that "in the over 19 years that a Behavior Health Department has existed at [Temple Hospital's] Episcopal campus, no minority individual has been promoted to a management level promotion." (Compl., ECF 1, ¶ 12.) However, at their depositions, Plaintiffs acknowledged that Temple Hospital has promoted numerous minority employees to Behavioral Health management positions. (ECF 9, ¶ 55.) Minorities over age 40 who have been hired or promoted into Behavioral Health management positions at Episcopal Hospital include, but are not limited to: (1) Wanda Cummings (African American, over 40), former Behavioral Health Program Director; (2) Williametta Simmons Bakasa (African American, over 40), former lead psychologist; (3) Danny Rivera (Latino, under 40), former Supervisor and then Director of Substance Abuse; (4) Venus Weaver (African American, over 40), promoted to Supervisor of Behavioral Health Therapy in 2014 before voluntarily resigning to return to clinical work; (5) Yasser Al-Khatib (Middle Eastern, over 40), former Director of Nursing; and (6) Chaudron Carter (African American, over 40), Al-Khatib's replacement as Director of Nursing. (*Id.* ¶ 56.) Episcopal Hospital also has minority managers in other departments. (*Id.* ¶ 57.) Of its current fifty-four manager/supervisor positions, nineteen (or thirty-five percent) are occupied by either African American (fourteen) or Hispanic (five) employees. (*Id.*)

### G. There Is No Other Record Evidence of Discrimination

At their depositions, no Plaintiff was aware of workplace comments about their race or age. (*Id.* ¶¶ 58, 59, 61.) Bowens only offered the failure to promote him to the UMBHT Director and Supervisor positions as evidence of Temple Hospital's alleged discriminatory conduct. He was not aware of any other actions taken by anyone at Episcopal Hospital based on his race or age. (*Id.*

¶ 58.) Verette had never heard anyone in hospital management make negative comments about any African Americans or about anyone's age and was likewise unable to cite any action taken against him or anyone else based on their age or race beyond his complaint about the UMBHT Director and Supervisor position promotions. (*Id.* ¶ 59.) Harrigan likewise only cited the promotion selections as evidence of any allegedly discriminatory conduct by Temple Hospital management and never made any other complaint involving alleged discrimination based on her race or age during her nine years at the Episcopal Campus. (*Id.* ¶¶ 60-61.)

Venus Weaver, a 66-year-old African American woman and friend of Verette who sat on the Supervisor promotion interview panel, testified to her belief that the selection process was fair and objective based on each applicant's abilities, experience, and interview and was without favoritism, bias, or prejudice based on race or age. (*Id.* ¶ 63.) She testified that she had never experienced any discrimination based on her age or race during her more than 20 years working in Behavioral Health at Episcopal Hospital. (*Id.*)

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant proves that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). Temple's motion is unopposed because the response deadline has lapsed, and Plaintiffs have not filed a response. Nevertheless, Plaintiffs' failure to respond "is not alone a sufficient basis for the entry of a summary judgment." *Anchorage Assocs. v. V. I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990). The Court "still must find for itself that there is no genuine dispute of material fact and that the movant deserves judgment as a matter of law." *United States v. Brace*, 1 F.4th 137, 143 (3d Cir. 2021).

A fact is "material" if it may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

At summary judgment, the Court may consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387-88 & n.13 (3d Cir. 1999). In doing so, the Court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may the Court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

### III. DISCUSSION

Plaintiffs assert claims for discrimination based on their race and age and for retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.*, and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951 *et seq*. The same analysis is used for claims under all three statutes. *See Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006) ("Claims under the PHRA are interpreted coextensively with Title VII claims."); *Fasold v. Justice*, 409 F.3d 178, 183, 188 (3d Cir. 2005) (describing the ADEA and PHRA discrimination provisions as "analogous" and explaining that "retaliation claims under both the ADEA and the PHRA typically proceed under the *McDonnell*

*Douglas* framework"). Temple Hospital seeks summary judgment on all counts. Because the record does not contain sufficient evidence to permit a jury to reasonably find in Plaintiffs' favor on any of their claims, the Court grants Temple Hospital's motion in its entirety.

A. **Discrimination**

Plaintiffs' race and age discrimination claims are governed by the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252-53 (1981). First, to make out a prima facie case, they must show they: (1) belong to a protected class; (2) were qualified for their positions; (3) suffered adverse employment actions; and (4) the circumstances surrounding the adverse actions give rise to an inference of discrimination. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999). Establishing a prima facie case is not a heavy burden. *McDonnell Douglas*, 411 U.S. at 802. In the absence of direct evidence, discrimination may be inferred based on comparator evidence— evidence that Temple Hospital treated similarly situated individuals not within Plaintiffs' protected class more favorably than it treated Plaintiffs. *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013); *see also Burdine*, 450 U.S. at 258 ("[I]t is the plaintiff's task to demonstrate that similarly situated employees were not treated equally.").

Then, if a Plaintiff establishes a prima facie case, Temple Hospital must offer a legitimate, non-discriminatory reason for the adverse employment action, *i.e.*, the failure to promote them. *See Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (*citing St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)). Finally, if the employer meets its burden, the burden of production returns to Plaintiffs to demonstrate that the legitimate reasons it offered were

a pretext, *i.e.*, not the true reasons, for race and/or age discrimination. *See, e.g., Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

### 1. Plaintiffs Fail to Establish a Prima Facie Case of Discrimination

The only record evidence available to support Plaintiffs' discrimination claims is the promotion of Kulp and Tuman, Caucasians who were under 40 years old, to the UMBHT Director and Supervisor positions. But the hiring of a person outside of a protected class is not, without more, enough to establish a prima facie case of discrimination. *Cf. Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998) ("[T]he mere favorable treatment of one younger manager as compared to one older manager may not be sufficient to infer age discrimination."). Here, there is nothing else.

To begin, it is Plaintiffs' burden to show that they were qualified for the promotions they sought. The record evidence of their qualifications for the UMBHT Director and Supervisor positions is questionable. Their annual evaluation scores consistently ranked in the bottom five percent of all Behavioral Health employees. (ECF 9, ¶ 33.) Each Plaintiff had discipline and performance issues before applying for the promotions at issue.[4] (*Id.* ¶¶ 35-40.) Plaintiffs also received the lowest scores for their performance during the UMBHT Director and Supervisor position interviews out of all of the interviewees. (*Id.* ¶¶ 19, 28.)

Even if the record evidence would allow a reasonable jury to conclude that Plaintiffs were qualified for the positions, they have not set forth any evidence to show that Temple Hospital failed to promote them under circumstances that suggest discriminatory animus. At their depositions, each acknowledged they had not encountered any comments, negative or otherwise, based on

---

[4]  Kulp and Tuman, the promoted employees, did not have pre-promotion performance problems. (*Id.* ¶ 41.)

13

employees' races or age during their tenure at Episcopal Hospital. (*Id.* ¶¶ 58-61.) Nor were they aware of any actions directed at others based on race or age during their employment. (*Id.*) There is no record evidence suggesting the existence of a Temple Hospital policy or pattern of discriminatory treatment of African Americans or people over age 40. Rather, there is evidence that Temple Hospital promoted a number of minority individuals and people over age 40 to management positions. (*Id.* ¶ 56.) Indeed 19 out of 54 positions at the manager/supervisor level are filled by either African American or Hispanic individuals. (*Id.* ¶ 57.)

Even if Plaintiffs believe they were more qualified for the promotions than Kulp and Tuman, that is not their decision to make. *See Steele v. Pelmor Lab'ys Inc.*, 642 F. App'x 129, 135 (3d Cir. 2016). A "'gut feeling' cannot substitute for actual evidence." *Id.*; *see also Jones*, 198 F.3d at 413-14 (holding that allegations predicated on nothing more than a plaintiff's belief are not enough to demonstrate pretext on summary judgment). Plaintiffs' unsupported, subjective belief that their race and/or age played a role in Temple Hospital's promotion decisions is simply not enough to establish an inference of discrimination at the summary judgment stage.

    2.    **There is No Evidence of Pretext**

Even assuming that any Plaintiff had established a prima facie case of discrimination, Temple Hospital would still be entitled to summary judgment. The record shows that Temple Hospital promoted Kulp and Tuman instead of Plaintiffs because the interview panelists applied objective criteria to each applicant and determined Kulp and Tuman were the most qualified for promotion. To show that Temple Hospital's legitimate non-discriminatory reason for not promoting them to the UMBHT Director and Supervisor positions was pretextual, Plaintiffs may point to evidence that would permit a reasonable jury to disbelieve Temple Hospital's reason for the promotions. *See Fuentes*, 32 F.3d at 764. Such evidence must indicate "such weaknesses,

14

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy a reasonable jury that Temple Hospital's actions could not have been for nondiscriminatory reasons. *Id.* at 765. Alternatively, Plaintiffs can point to evidence that would allow a reasonable jury to believe that a discriminatory reason was "more likely than not a motivating or determinative cause" of Temple Hospital's promotion decisions. *Id.* at 764. Plaintiffs use this method of proving pretext by presenting evidence that Temple Hospital: (1) previously discriminated against them; (2) discriminated against others within Plaintiffs' protected class; or (3) treated similarly situated, younger individuals or non-African American individuals more favorably. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 645 (3d Cir. 2015). The question is not whether Temple Hospital "made the best, or even a sound, business decision" when it promoted Kulp and Tuman; it is whether discrimination is the real reason for not choosing Plaintiffs for the promotions instead. *Keller v. Orix Credit All., Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997).

No Plaintiff has set forth any evidence to cast doubt on Temple Hospital's legitimate explanation for the decisions to promote Kulp and Tuman instead of Plaintiffs. There is no evidence that Temple Hospital previously discriminated against Plaintiffs or discriminated against other older or African American employees. And the record evidence of Plaintiffs' performance history would not lead a reasonable juror to believe that Kulp and Tuman were similarly situated comparators. Plaintiffs have done nothing to show that Temple's proffered reason for promoting the others "was so plainly wrong that it cannot have been [Temple Hospital's] real reason." *Id.* at 1109. The Court grants summary judgment in favor of Temple Hospital with respect to Plaintiffs' discrimination claims.

B. **Retaliation**

Because the record lacks any direct evidence of retaliation, the Court also applies the *McDonnell Douglas* burden-shifting framework to Plaintiffs' retaliation claims. *See Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017) (considering Title VII retaliation claim using *McDonnell Douglas* burden shifting); *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (considering Title VII and ADEA retaliation claims together using *McDonnell Douglas* framework). At the prima facie stage Plaintiffs must produce evidence "sufficient to raise the inference that [their] protected activity"—here, their October 2018 complaint to Human Resources about the UMBHT Director and Supervisor position promotions—"was the *likely reason* for the adverse [employment] action." *Carvalho-Grevious*, 851 F.3d at 259 (emphasis in original, citation and internal quotation omitted). And to establish causation at this stage, Plaintiffs must set forth enough evidence about the "scope and nature of conduct and circumstances" to support the inference of a causal connection between the protected activity and adverse action. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000). "[V]ery close temporal proximity between the adverse action and the protected activity may be 'unusually suggestive' of a causal connection." *Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 96 (3d Cir. 2016) (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). Plaintiffs also can rely on "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for terminating the employee, or any other evidence in the record sufficient to support the inference of retaliatory animus." *LeBoon*, 503 F.3d at 232-33.

If Plaintiffs can establish a prima facie case of retaliation, the burden shifts back to Temple Hospital to provide a legitimate non-retaliatory reason for its conduct. *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006). If it does so, the burden returns to Plaintiffs "to convince the

16

factfinder both that [Temple Hospital's] proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (internal quotation and citation omitted).

Although "the burden of production of evidence shifts back and forth," Plaintiffs have "the ultimate burden of persuasion at all times." *Carvalho-Grevious*, 851 F.3d at 257 (citation and internal quotation marks omitted). Their "ultimate burden is to prove that retaliatory animus was the 'but-for' cause of the adverse employment action." *Id.* at 258 (citing *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360.

### 1. Plaintiffs Fail to Establish a Prima Facie Case of Retaliation

No Plaintiff makes the required showing of causation to establish a prima facie case of retaliation. The Court considers the circumstances of their retaliation claims "as a whole," including any evidence "suggesting that [Temple Hospital] had a retaliatory animus when taking the adverse action[s]" claimed. *Daniels*, 776 F.3d at 196.

Harrigan's retaliation claim is based on the written warning discipline she received in November 2018 for theft of time. (ECF 9, ¶ 49-51.) While her warning was issued within a month after the Human Resources complaint about the UMBHT Director and Supervisor position promotions, temporal proximity alone is not necessarily enough to support a prima facie case of retaliation. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1302 (3d Cir. 1997) ("[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events"), *overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Considering the entire summary judgment record, more than temporal proximity is required here. Harrigan

acknowledged her conduct violated the hospital's theft of time policy. (*Id.* ¶ 51.) And although she could have been immediately terminated for her policy violation, she received a warning instead. (*Id.* ¶ 50.) Moreover, Harrigan has not shown the individual responsible for issuing her warning knew about the Human Resources complaint when Harrigan was disciplined for going to Dunkin' after clocking in for the day. *See Andreoli v. Gates*, 482 F.3d 641, 650 (3d Cir. 2007).

To support his retaliation claim, Bowen cites a single discipline, issued in October 2019, more than a year after the Human Resources complaint. It lacks the temporal proximity required to be "unusually suggestive" of causation. *See Daniels*, 776 F.3d at 198 (holding ten months insufficient to establish causal connection). Moreover, Bowen testified that the discipline was not issued because he filed the Human Resources complaint. (ECF 9, ¶ 53.) Rather, it was issued for ongoing performance issues that began before he ever went to Human Resources to complain about the UMBHT Director and Supervisor position promotions. (*Id.* ¶ 35, 52.)

Verette's retaliation claim is based on the October 2019 discipline he received for violating Temple Hospital's policies regarding the presence of glass in units housing patients with serious mental illness. Although he could have been terminated for bringing glass into his unit, actions which ultimately permitted a patient to harm herself, he was suspended for just two weeks. (ECF 9, ¶ 46-47.) Verette's discipline, like Bowen's, lacks the temporal proximity needed to establish causation in the absence of other corroborating evidence. *See, e.g., Lipschultz v. Holy Family Univ.*, No. 15-5760, 2017 WL 1331731, at *8 (E.D. Pa. Feb. 17, 2017) ("While periods of days or weeks may be considered unusually suggestive, a period of many months is generally not."). Considering the circumstances of his discipline and the absence of any other record evidence of retaliatory animus, the record is not sufficient to permit a reasonable jury to conclude that Verette was disciplined in retaliation for the Human Resources complaint.

**2.     There is No Evidence of Pretext**

Even if any of the Plaintiffs were able to establish a prima facie case of retaliation, Temple Hospital would still be entitled to summary judgment. No Plaintiff has set forth any evidence to cast doubt on Temple Hospital's legitimate explanation for its disciplinary actions, let alone "sufficient evidence to prove that retaliatory animus was the 'but-for' cause of" their having been disciplined. *Carvalho-Grevious*, 851 F.3d at 258 (citation omitted). Each of them agreed they were disciplined in accordance with Temple Hospital policy and that they were given lenience for their actions. (ECF 9, ¶¶ 48, 51, 53.) The Court grants summary judgment in favor of Temple Hospital with respect to Plaintiffs' retaliation claims.

An Order consistent with this Memorandum will be docketed separately.